DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN

|  |  |  |
|---|---|---|
| C.A.F. BY AND THROUGH HIS PARENTS AND NEXT OF FRIENDS A.F. AND R.F., | ) ) ) ) | |
| Plaintiff, | ) ) ) | Civil No. 2006-102 |
| v. | ) ) ) | |
| LAVERNE TERRY, COMMISSIONER OF THE DEPARTMENT OF EDUCATION AND CARRIE JOHNS, ACTING STATE DIRECTOR OF THE OFFICE OF SPECIAL EDUCATION, | ) ) ) ) ) | |
| Defendants. | ) ) ) | |

**APPEARANCES**

**Archie Jennings, Esq.**
St. Thomas, U.S.V.I.
       *For the plaintiff.*


**Aquannette Y. Chinnery-Montell, Esq.**
**Carol Thomas-Jacobs, Esq.**
**Tamika Archer, Esq.**
St. Thomas, U.S.V.I.
       *For the defendants.*

<u>MEMORANDUM OPINION</u>

**GÓMEZ, C.J.**

     This matter is before the Court for adjudication on stipulated facts in the record.  The plaintiff, C.A.F. ("CAF") by and through his parents and next of friends, A.F. and R.F. (jointly, the "plaintiffs"), has provided the record from the administrative proceedings below.  Also before the Court is the

*C.A.F. v. Michael, et al.*
Civil No. 2006-102
Memorandum Opinion
Page 2

motion of defendants[1] LaVerne Terry ("Terry"), commissioner of

the Department of Education, and Carrie Johns ("Johns"), Acting

State Director of the Office of Special Education (jointly, the

"defendants"), to dismiss for failure to prosecute, failure to

issue process, and failure to serve the government of the Virgin

Islands.  In the alternative, the defendants seek summary

judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

CAF attended Charlotte Amalie High School ("CAHS"), in St.

Thomas, U.S. Virgin Islands.  When he was 19 years old, he

completed the 12th grade.  CAF suffers from an autistic disorder,

a pervasive developmental disorder, mild mental retardation, and

a seizure disorder.  As a consequence, he received special

education at CAHS and transition services through the Virgin

Islands Department of Education (the "VIDOE").  While CAF is

disabled, he is able to communicate with others, use public

transportation, and read, among other skills.

CAF, through his parents, A.F. and R.F., requested that the

VIDOE include more services for CAF in his Individualized

---

[1] The complaint originally named as defendants Noreen Michael, Commissioner of the Department of Education and Carrie Johns, Acting State Director of the Office of Special Education.  Pursuant to Federal Rule of Civil Procedure 25(d), the Court has edited the caption, substituting Noreen Michael with LaVerne Terry, the current Commissioner of the Department of Education.

*C.A.F. v. Michael, et al.*
Civil No. 2006-102
Memorandum Opinion
Page 3

Education Program ("IEP").[2]  They requested that CAF be placed

"in a facility that could bring his functional ability up to his

intellectual capacity, so that he could function more

independently." (Compl. 4.)  Specifically, they asked that VIDOE

pay for CAF's placement into a full time residential facility off

island.  The VIDOE denied that request.  Instead the VIDOE

offered CAF a thirteenth year of high school after he graduated

from CAHS.  The plaintiffs appealed that VIDOE decision.[3]

A hearing on the appeal took place on July 20 and 21, 2005.

The hearing officer issued a decision in favor of VIDOE on May

31, 2006.  The hearing officer found that the VIDOE had provided

a free and appropriate public education ("FAPE") to CAF.  The

hearing officer also found that CAF was not entitled to

compensatory education or services.

Thereafter, the plaintiff filed this three-count action

challenging the administrative decision pursuant to the

_____

[2] Pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, a disabled child is entitled to the development of an individualized education program ("IEP"), which is a written statement including information about his present level of academic achievement, measurable annual goals including academic and functional goals, criteria for measuring progress, and a statement of special education and related services and supplementary aids the child will be provided, based on peer reviewed research, among other things. *See* 20 U.S.C. § 1414(d).

[3] 20 U.S.C. § 1415(g)(1) provides, in relevant part, that "any party aggrieved by the findings and decision rendered in such a hearing may appeal such findings and decision to the State educational agency."

*C.A.F. v. Michael, et al.*
Civil No. 2006-102
Memorandum Opinion
Page 4

Individuals with Disabilities Education Act, 20 U.S.C. §
1415(i)(2)(A) ("IDEA") and the V.I. Education of the Handicapped
Act, V.I. CODE ANN. tit. 17, § 281 *et seq.* ("VIEHA"). CAF also
brought claims under 42 U.S.C. § 1983.  Count I, seeks a
declaration that the defendants have violated the IDEA, 20 U.S.C.
§ 1415 *et seq.* and the VIEHA.  Count II seeks to enjoin the
defendants and their agencies from denying CAF a full, complete,
and meaningful education.  Count III seeks attorney's fees,
pursuant to 42 U.S.C. § 1988.

The parties have submitted the record below.  The issues
presented at the administrative hearing were the same as those
presented in CAF's complaint in the instant case: (1) whether
VIDOE failed to provide a FAPE to CAF as required by the IDEA and
the corresponding provisions of the VIEHA, and (2) whether in
order to provide a FAPE, the VIDOE must provide compensatory
services in a private residential program of instruction at no
cost to CAF or his parents. (Administrative Decision and Order 1;
Compl. ¶¶ 11, 17.)

The parties do not dispute that CAF attended Charlotte
Amalie High School ("CAHS"), a public high school, at public
expense.  A representative from the Department of Education
("VIDOE") testified that CAF's education complied with
territorial educational standards.  Further, the parties agree

*C.A.F. v. Michael, et al.*
Civil No. 2006-102
Memorandum Opinion
Page 5

that CAF was provided with an Individualized Education Program ("IEP") each year he attended CAHS, in accordance with the requirements of the IDEA and the VIEHA.

On November 12, 2009, the matter came on for an administrative hearing on the defendants' motion to dismiss or for summary judgment.  At the hearing, the parties indicated that the administrative record on review had not yet been submitted to the Court as contemplated by 20 U.S.C. § 1415(i)(2)(C).[4]  The parties further indicated that a hearing or trial on the merits of this matter is unnecessary, and that the Court can decide the matter based on the submissions of the parties.

The Court ordered the plaintiffs to file with the Court, no later than November 20, 2009, the administrative record on review.  On November 18, 2009, the defendants and the plaintiffs filed the administrative record.

## II. DISCUSSION

### A. Dismissal for Failure to Prosecute

Pursuant to *Poulis v. State Farm Fire and Casualty*, 747 F.2d

---

[4] 20 U.S.C. § 1415(i)(2)(C) provides in pertinent part:

(C)

In any action brought under this paragraph, the court--
    (i) shall receive the records of the administrative proceedings;
    (ii) shall hear additional evidence at the request of a party; and
    (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

*C.A.F. v. Michael, et al.*
Civil No. 2006-102
Memorandum Opinion
Page 6

863 (3d Cir. 1984), a district court should consider the following factors when contemplating dismissal for failure to prosecute pursuant to Federal Rule of Civil Procedure 41(b):

> (1) the extent of the party's personal responsibility; (2) the prejudice to the adversary caused by the failure to meet scheduling orders and respond to discovery; (3) a history of dilatoriness; (4) whether the conduct of the party or the attorney was willful or in bad faith; (5) the effectiveness of sanctions other than dismissal, which entails an analysis of alternative sanctions; and (6) the meritoriousness of the claim or defense.

*Id*. at 868.

## B. Dismissal for Failure to Issue Process and to Serve the Government of the Virgin Islands

Although not cited by the defendants, the motion to dismiss for failure to issue process and serve the government is functionally one made pursuant to either Federal Rule of Civil Procedure 12(b)(4), for insufficient process or Rule 12(b)(5), for insufficient service of process.

## C. IDEA Standard of review

"When deciding an IDEA case, the District Court applies a modified version of *de novo* review and is required to give due weight to the factual findings of the ALJ." *L. E. v. Ramsey Bd. Of Educ.*, 435 F.3d 384, 389 (3d Cir. 2006); *see also Shore Regional High Sch. Bd. of Educ. v. P.S. ex rel P.S.*, 381 F.3d

*C.A.F. v. Michael, et al.*
Civil No. 2006-102
Memorandum Opinion
Page 7

194, 199 (3d Cir. 2004).

In an IDEA administrative review, "the district court must conduct an independent review based on the preponderance of the evidence but in doing so due weight shall be given to [state administrative] proceedings." *Polk v. Central Susquehanna Intermediate Unit 16*, 853 F.2d 171, 173 (3d Cir. 1988); *see also Lillbask v. Conn. Dep't of Educ.*, 397 F.3d 77, 82 (2d Cir. 2005) ("In conducting judicial review, federal courts are expected to give 'due weight' to [the administrative] proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." (citation and internal quotation marks omitted)).

> 'In addition, if a state administrative agency has heard live testimony and has found the testimony of one witness to be more worthy of belief than the contradictory testimony of another witness, that determination is due special weight. Specifically, this means that a District Court must accept the state agency's credibility determinations "unless the non-testimonial, extrinsic evidence in the record would *justify* a contrary conclusion." (emphasis added). In this context the word "justify" demands essentially the same standard of review given to a trial court's findings of fact by a federal appellate court.'

*L.E.*, 435 F.3d at 389 n. 4 (quoting *Shore Reg'l*, 381 F.3d at 199).

*C.A.F. v. Michael, et al.*
Civil No. 2006-102
Memorandum Opinion
Page 8

However, the legal conclusions of the administrative hearing officer receive plenary review.

> [T]he "due weight" we ordinarily must give to the state administrative proceedings is *not implicated with respect to* . . . issues of law, such as the proper interpretation of the federal statute and its requirements. . . . state hearing officers are not more experienced or expert than courts in interpreting federal statutes or the federal constitution, and, therefore, deference is not warranted.

*Lillbask*, 397 F.3d at 82 (internal citations and quotation marks omitted; emphasis in original); *see also Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 528 n. 3 (3d Cir. 1995) ("Obviously, conclusions of law receive plenary review." (citation omitted)).

Further, the district court must "hear additional evidence at the request of a party,"[5] 20 U.S.C. § 1415(i)(2)(C)(ii), and must "make its own findings by a preponderance of the evidence." *Shore Reg'l*, 381 F.3d at 199; *see also* 20 U.S.C. § 1415(i)(2)(C)(iii).

"[W]here the District Court does not hear additional evidence it must find support for any factual conclusions contrary to [those of the administrative agency] in the record before it." *S.H. v. State-Operated Sch. Dist. of Newark*, 336 F.3d

---

[5] In the instant case, none of the parties have requested the Court take additional evidence.  The parties have stipulated that a disposition based on their filed submissions is appropriate.

*C.A.F. v. Michael, et al.*
Civil No. 2006-102
Memorandum Opinion
Page 9

260, 270 (3d Cir. 2003).

Further, under the IDEA, where a party seeks review of an administrative law judge's decision, the burden of proof lies with the party challenging the administrative decision. *See L.E. v. Ramsey Bd. Of Educ.* 435 F.3d 384, 392 (3d Cir. 2006) (noting that the ALJ and the district court incorrectly placed the burden of proof on appellees).

**1. The IDEA's FAPE requirement**

The IDEA defines a FAPE as

> special education and related services that--
>     (A) have been provided at public expense, under public supervision and direction, and without charge;
>     (B) meet the standards of the State educational agency;
>     (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and
>     (D) are provided in conformity with the individualized education program required under section 614(d) [20 USCS § 1414(d)].

20 U.S.C. § 1401(9). Furthermore, the FAPE's provision of special education must be "specially designed . . . to meet the unique needs of a child with a disability," § 1401(29), and must be coupled with any additional "related services" that are "required to assist a child with a disability to benefit from special education . . . ." § 1401(26)(A).

In *Board of Education v. Rowley*, 458 U.S. 176 (1982)*,* a deaf

child alleged that her school district was obligated to provide

an interpreter for her in order to comply with the FAPE

requirement of the IDEA's predecessor legislation, the Education

of the Handicapped Act.  *Rowley* concerned a deaf child who was an

excellent lip reader, an above average student attending a school

that had made substantial efforts to assist her, and who was

progressing from grade to grade in a regular classroom, but who

was denied a publicly-funded, full-time interpreter. *Id*. at

184-86.  The lower courts had interpreted the Act's FAPE

requirement to mean that the school district had to provide an

interpreter, because such an aid would maximize the student's

educational potential. *Id.* at 186.

On review, the Supreme Court took a close look at the FAPE

requirement, and explained:

> According to the definitions contained in the Act, a
> "free appropriate public education" consists of
> educational instruction specially designed to meet the
> unique needs of the handicapped child, supported by
> such services as are necessary to permit the child "to
> benefit" from the instruction. Almost as a checklist
> for adequacy under the Act, the definition also
> requires that such instruction and services be provided
> at public expense and under public supervision, meet
> the State's educational standards, approximate the
> grade levels used in the State's regular education, and
> comport with the child's IEP. Thus, if personalized
> instruction is being provided with sufficient
> supportive services to permit the child to benefit from
> the instruction, and the other items on the
> definitional checklist are satisfied, the child is
> receiving a "free appropriate public education" as

*C.A.F. v. Michael, et al.*
Civil No. 2006-102
Memorandum Opinion
Page 11

defined by the Act.

*Id.* at 188-189.  "Noticeably absent from the language of the statute is any substantive standard prescribing the level of education to be accorded handicapped children. Certainly the language of the statute contains no requirement . . . that States maximize the potential of handicapped children commensurate with the opportunity provided to other children." *Id.* at 189-90.

> By passing the Act, Congress sought primarily to make public education available to handicapped children. But in seeking to provide such access to public education, Congress did not impose upon the States any greater substantive educational standard than would be necessary to make such access meaningful. Indeed, Congress expressly "[recognized] that in many instances the process of providing special education and related services to handicapped children is not guaranteed to produce any particular outcome." S. Rep., at 11. Thus, the intent of the Act was more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside.

*Id.* at 192.  In reversing the decisions of courts below, the Supreme Court ruled that,

> [t]he District Court and the Court of Appeals . . . erred when they held that the Act requires New York to maximize the potential of each handicapped child commensurate with the opportunity provided nonhandicapped children. Desirable though that goal might be, it is not the standard that Congress imposed upon States which receive funding under the Act. Rather, Congress sought primarily to identify and evaluate handicapped children, and to provide them with access to a free public education.

*Id*. at 200.  Despite the courts' longstanding reliance on *Rowley*

*C.A.F. v. Michael, et al.*
Civil No. 2006-102
Memorandum Opinion
Page 12

as providing the standard against which to measure a FAPE, the

Supreme Court itself has expressed reservations about attempting

to generate a general standard from that case:

> We do not attempt today to establish any one test for
> determining the adequacy of educational benefits
> conferred upon all children covered by the Act. Because
> in this case we are presented with a handicapped child
> who is receiving substantial specialized instruction
> and related services, and who is performing above
> average in the regular classrooms of a public school
> system, we confine our analysis to that situation.[6]

*Id.* at 202.

The United States Court of Appeals for the Third Circuit,

while relying on *Rowley*, has held that the "benefit" conferred on

disabled children by their state sponsored education must be more

than *de minimis* or trivial. *Polk v. Central Susquehanna*

*Intermediate Unit 16*, 853 F.2d 171, 180 (3d Cir. 1988). "We hold

that the EHA [predecessor to the IDEA] calls for more than a

---

[6] Although the Supreme Court does not establish a test to determine the adequacy of educational benefits conferred upon a child under the Act, the legislative history of the 1983 amendments to the Act reaffirm the Congressional intent of providing a broad definition of special education. Congress stated that "special education" shall meet the "unique education needs" of handicapped children.  It further stated that "the term of 'unique education needs' be broadly construed to include the handicapped child's academic, social, health, emotional, communicative, physical and vocational need." H.R. Rep. No. 410, 98th Cong., 1st Sess. 19 (1983), reprinted in 1983 U.S. Code Cong. & Admin. News 2088, 2106.  The Third Circuit has stated, "[w]here basic help and social skills such as toilet training, dressing, feeding and communication are lacking, formal education begins at that point." Battle v. Pennsylvania, 629 F.2d 269 (3d Cir. 1980).  The First Circuit noted that education may not only consist of classroom training but also training in very basic life skills. *Abrahamson v. Hershman*, 701 F.2d 223, 228 (1st Cir. 1983).

*C.A.F. v. Michael, et al.*
Civil No. 2006-102
Memorandum Opinion
Page 13

trivial educational benefit. That holding rests on the Act and
its legislative history as well as interpretation of *Rowley*." *Id.*

> Further,

> [a] school district that knows or should know that a
> child has an inappropriate Individualized Education
> Program (IEP) or is not receiving more than a *de
> minimis* educational benefit must, of course, correct
> the situation. We hold that, if it fails to do so, a
> disabled child is entitled to compensatory education
> for a period equal to the period of deprivation,
> excluding only the time reasonably required for the
> school district to rectify the problem.

*M.C. v. Central Regional Sch. Dist.*, 81 F.3d 389, 391-392 (3d
Cir. 1996). "*Rowley* makes it perfectly clear that the Act
requires a plan of instruction under which educational *progress*
is likely. The Act . . . requires a plan likely to produce
progress, not regression or trivial educational advancement."
*Board of Educ. v. Diamond*, 808 F.2d 987, 991 (3d Cir. 1986)
(emphasis in original; citation omitted) (rejecting school
district's proposed legal test under which the district would be
obliged only to offer a child an education that was "of benefit"
to him)).

**D. Requirements under Virgin Islands law**

In contrast to the federal IDEA, the Virgin Islands
Education of the Handicapped Act ("VIEHA"), V.I. CODE ANN. tit.
17, § 281 *et seq.*, requires the "Territory to provide, as an

C.A.F. v. Michael, et al.
Civil No. 2006-102
Memorandum Opinion
Page 14

integral part of the free public education, special education

sufficient to meet the needs and *maximize the capabilities* of

handicapped children." § 281 (emphasis added).

The VIEHA, like the IDEA, requires the provision of a FAPE.

However, the VIEHA sets a considerably higher standard[7] than the

IDEA against which the education provided to handicapped children

is to be measured.

Further, under the VIEHA a plaintiff must establish their

---

[7] Similar to the Virgin Islands Code, other State Statutes have imposed
a higher standard than the IDEA.  Massachusetts requires that its special
education programs "assure the maximum possible development" of handicapped
students.  *See* Mass. Gen. L. Ch. 71B. § 2.  This standard is higher than the
federal floor.

In *Roland M. v. Concord*, the court held that maximizing academic
potential is not limited to academic progress and includes, *inter alia*,
socialization training. 910 F.2d 983, 992 (1st Cir. 1990) ("Thus, purely
academic progress-maximizing academic potential-is not the only indicia of
educational benefit implicated either by the Act or by state law.")

"[A]cademic potential is one factor to be considered, those who
formulate IEPs must also consider what, if any, 'related services,' 20 U.S.C.
§ 1401(17), are required to address a student's needs."  *Irving Independent
School Dist. v. Tatro*, 468 U.S. 883, (1984).  Among the related services that
must be included in an appropriate education are,

means transportation, and such developmental, corrective, and other
supportive services (including speech-language pathology and audiology
services, interpreting services, psychological services, physical and
occupational therapy, recreation, including therapeutic recreation,
social work services, school nurse services designed to enable a child
with a disability to receive a free appropriate public education as
described in the individualized education program of the child,
counseling services, including rehabilitation counseling, orientation
and mobility services, and medical services, except that such medical
services shall be for diagnostic and evaluation purposes only) as may be
required to assist a child with a disability to benefit from special
education, and includes the early identification and assessment of
disabling conditions in children. ]

20 U.S.C. § 1401(26).

*C.A.F. v. Michael, et al.*
Civil No. 2006-102
Memorandum Opinion
Page 15

case by a preponderance of the evidence. *Armstrong Ford, Inc. v. Campbell*, 14 V.I. 337, 341 (D.V.I. 1977) ("The law is quite clear that in a civil case the plaintiff must establish her case by a preponderance of the evidence. . . .")

### III. <u>ANALYSIS</u>

**A. Defendants' Motions to Dismiss**

**1. Failure to prosecute**

The defendants argue that this Court should dismiss this case for failure to prosecute, pursuant to Fed. R. Civ. P. 41(b).

A plaintiff has the duty to diligently proceed with his action. *See Lyell Theatre Corp. v. Loews Corp.*, 682 F.2d 37, 43 (2d Cir. 1982)(citing *Messenger v. United States*, 231 F.2d 328, 331 (2d Cir. 1956)). In this case, after some inexplicable delays early in its history, including the failure to timely file pleadings, plaintiffs' counsel appeared at a hearing. Further, plaintiffs filed the administrative record in response to this Court's order, and have filed a summary judgment motion. The Court cannot say that there has been a failure to prosecute this action that even requires an analysis of the *Poulis* factors.

Accordingly, the Court will deny the motion to dismiss to the extent that it relies on plaintiffs' failure to prosecute.

*C.A.F. v. Michael, et al.*
Civil No. 2006-102
Memorandum Opinion
Page 16

## 2. Failure to serve the government of the Virgin Islands and the governor

The defendants argue that the plaintiffs had to serve the government of the Virgin Islands in this matter.  They cite *Blunt v. Lower Merion Sch. Dist.*, 559 F. Supp 2d 548 (E.D. Pa. 2008), for the proposition that a suit against "individuals in their official capacities is the functional equivalent of suing the government entity which those individuals serve."  They further cite, *McCachren v. Blacklick Valley Sch. Dist.*, 217 F. Supp. 2d 594, 599 (E.D. Pa. 2002), for the proposition that in an action under the IDEA against persons sued only in their individual capacities, the government's liability is at issue and not that of the individuals named in their official capacities.

The defendants argue that because the government's liability is at issue, and because this lawsuit functionally seeks relief from the government, not the named individuals, the plaintiffs were required to serve the government.  However, the Court notes that the plaintiffs have named two territorial government employees in their official capacities as defendants.

The governor and the government of the Virgin Islands are not named defendants in this case.  A search of the relevant case law has not uncovered any cases holding that a plaintiff who sues

*C.A.F. v. Michael, et al.*
Civil No. 2006-102
Memorandum Opinion
Page 17

state officials only in their official capacity must also serve
the governor or the government of the state.[8]

    In fact, the typical defendant in an IDEA suit is a school
board member, public education official, or special education
official. *See, e.g., A.W. v. Jersey City Pub. Sch.*, 486 F.3d 791,
793 (3d Cir. 2007) ("In addition to suing [Jersey City Public
Schools] and its officials, A.W. also brought claims against
Barbara Gantwerk, Director of the Office of Special Education
Programs for the New Jersey Department of Education ("NJDOE"),
and Melinda Zangrillo, Coordinator of Compliance at NJDOE, in
their personal capacities."); *L. E. v. Ramsey Bd. of Educ.*, 435
F.3d 384, 387 (3d Cir. 2006) ("Appellants L.E. and E.S., parents
of M.S., brought this action against the Ramsey Board of
Education ('the Board') and individual employees of the Board,
appellees herein, alleging violations of the Individuals with
Disabilities Education Act").

    The Virgin Islands Code also does not provide that a party
suing a territorial official in his official capacity must name
or serve the government of the Virgin Islands.  Having found no
statute or case law to support the proposition that the governor

---

[8] Further, while Federal Rule of Civil Procedure 4(i) requires a party
suing an officer of the United States to serve the United States, the Federal
Rules do not provide any particular rule for a party suing a state official,
only for suing states themselves. *See* Fed. R. Civ. P. 4(j).

*C.A.F. v. Michael, et al.*
Civil No. 2006-102
Memorandum Opinion
Page 18

or the Virgin Islands government had to be named or served in this suit, the Court finds that the defendants' motion to dismiss for insufficient process or insufficient service of process is without merit.  The motion to dismiss on those grounds will be denied.

### 3. The § 1983 claim

The defendants argue that the plaintiffs' 42 U.S.C. § 1983 claim must be dismissed because the claim is preempted by the IDEA. In *A.W. v. Jersey City Public Schools,* 486 F.3d 791 (3d Cir. 2007), the United States Court of Appeals for the Third Circuit squarely addressed the question of whether "an action can be maintained against school officials under 42 U.S.C. § 1983 for violations of the Individuals with Disabilities Education Act ('IDEA'), 20 U.S.C. § 1400 et seq." *Id.* at 792.  The court determined that Congress had created a comprehensive remedial scheme with the IDEA and "did not intend § 1983 to be available to remedy violations of the IDEA." *Id.* at 803.

Accordingly, the Court will dismiss the plaintiff's § 1983 claim.

## B. Disposition of the Merits

### 1. Disagreement as to whether CAF's Education Maximized his Potential

The parties disagree about whether CAF's education was

*C.A.F. v. Michael, et al.*
Civil No. 2006-102
Memorandum Opinion
Page 19

appropriate.  The plaintiffs allege that CAF's education did not

meet his needs or maximize his potential.  They argue that in

order to learn social and life skills, CAF needed residential

placement off island.  The defendants disagree, arguing that

CAF's education did maximize his potential, and argue that in any

event, they are not legally required to provide such services.

CAF's mother and father testified that CAF did not, at the

time he completed CAHS, have appropriate life skills.  They felt

CAF's skill development had not progressed during his time at

CAHS and that he was not fulfilling his potential, and was even

regressing.  (July 20, 2005 Tr. 35, 91-92.)  His parents were

concerned about CAF's ability to function as a somewhat

independent adult, and sought out a transitional program to

assist him in developing life skills. (*Id.* at 36.)  Parental

testimony can provide a valuable source of insight in determining

whether a child's education is appropriate.  *See, e.g.*, *Board of

Educ. v. Diamond,* 808 F.2d 987, 990-991 (3d Cir. 1986) (noting

district court's reliance, in part, on mother's testimony about

child's behavior).

CAF's parents found a live-in residential program that

incorporates education and works with businesses to provide on

the job training for disabled children.  They requested that

VIDOE pay for the program they found, but VIDOE refused that

*C.A.F. v. Michael, et al.*
Civil No. 2006-102
Memorandum Opinion
Page 20

request. (Hrg. Tr. 147-148, 162-163.)

Dr. Hillary Wynn ("Wynn"), a board certified
child/adolescent psychiatrist, also testified at the hearing.
Wynn did a complete psychiatric evaluation of CAF.  Wynn
testified that CAF's IEP goals regarding vocational training and
social skills had been met very minimally, in the range of 0% to
50%.[9]  (Hrg. Tr. 113.)  Because Wynn's evaluation of CAF
concluded that in the two years she had been seeing him, he had
stagnated under the course of education provided by the VIDOE,
she recommended he receive compensatory education. (Hrg. Tr.
114.)

Wynn also testified that on St. Thomas there are no
specialists capable of treating someone like CAF, who has a
pervasive developmental disorder.  Accordingly, she recommended
the residential placement sought by his parents be provided to
CAF.  (Hrg. Tr. 129-130.)

Dr. Lori Thompson ("Thompson"), a clinical psychologist who
evaluated CAF, filed a report with his IEP team.  The report was

---

[9] When asked whether Allan's social skills were within the expected
range for a student with his intellectual ability, Dr. Wynn stated, "His
social skills are in a range which is a broad range for Pervasive
Developmental Disorder.  Some don't communicate at all, some communicate very
well, so the range is very broad for Pervasive Developmental Disorder.  So
that's a difficult question to respond to.  I guess he's with the large range,
yes, form the higher end.  We would say he's closer to maybe, above 50 percent
range as far as social skills ability at this point."

*C.A.F. v. Michael, et al.*
Civil No. 2006-102
Memorandum Opinion
Page 21

admitted into evidence during the administrative hearing.

Thompson stated that:

> [CAF's] deficits in regard to his socialization and
> independent living skills suggest the need for
> intensive, daily training in these basic skills. It is
> unlikely that a typical, 8 a.m. to 3 p.m., special
> education program would be able to adequately provide
> [CAF] with the type of intensive work that will be
> required to increase his level of functioning. Rather,
> a residential facility specifically trained in the
> treatment of Autism Spectrum Disorders is recommended,
> particularly given his increasing age and the immediate
> need to equip [CAF] to function independently once he
> becomes an adult.

(Ex. 6 p. 8)

The VIDOE presented the testimony of several of CAF's
special education teachers.  One such witness was Edwin Forbes
("Forbes").  CAF was in Forbes' modified instruction class for 90
minutes a day, every day of the school year, from 2002 to 2005.
(Hrg. Tr. 65)

Forbes was a member of CAF's IEP team and his transition
team.  Forbes testified that the objectives of those teams
included increasing CAF's skills with regard to basic banking.
To that end, CAF took a career education class in which he
learned skills such as planning a budget and balancing a check
book.  CAF also took a home maintenance class in which he learned
some cleaning and laundry skills, and gained very limited cooking
skills. (Hrg. Tr. 72, 75)

*C.A.F. v. Michael, et al.*
Civil No. 2006-102
Memorandum Opinion
Page 22

Forbes testified that CAF's IEP was well fitted to CAF's needs.  Forbes also said that the IEP team came up with ideas for job placements for CAF, such as having him read to children at a daycare or being a cruise ship greeter, but that those suggestions were rejected by CAF's parents. (Hrg. Tr. 79)

Nydia Lewis ("Lewis"), another special education teacher at CAHS, also testified.  Lewis was CAF's home room teacher for three years.  She also taught him reading, math, Virgin Islands government, and history for a semester.  The math class focused on money skills, shopping, and making change. (Hrg. Tr. 175-176)

Lewis testified that she was not sure CAF's IEP was specifically designed to meet his needs. (Hrg. Tr. 180) She also testified that she did not have a clear understanding of the nature of Pervasive Developmental Disorder, but knew CAF was autistic. (Hrg. Tr. 189)  The plaintiffs argue that this testimony supports the contention that CAF's IEP could not have been tailored to his needs, because some of the members of the IEP team did not fully understand his disability.

Josette Harrington ("Harrington"), another of CAF's special education teachers, also testified.  She taught CAF math and computer skills.(Hrg. Tr. 203)  She stated that CAF became familiar with the use of some of the keys on a keyboard. (Hrg. Tr. 205) She testified that CAF's IEP was designed around his

*C.A.F. v. Michael, et al.*
Civil No. 2006-102
Memorandum Opinion
Page 23

needs and abilities. (Hrg. Tr. 207) However, she also testified
that CAF needed life skills training that the VIDOE could not
provide on St. Thomas. (Hrg. Tr. 210-211.) She stated that she
was not informed by VIDOE of any of CAF's specific needs. (Hrg.
Tr. 213.) She decided what he needed based on her own
observations. (Hrg. Tr. 216)

Madelyn Lake-Thomas ("Lake-Thomas"), a VIDOE secondary
transitioning supervisor in the office of special education, also
testified. (Hrg. Tr. 219) She was responsible for overseeing and
implementing CAF's IEP and his transition plan.  She testified
that she believes CAF's IEP was designed to meet his needs, and
did in fact meet his needs.  (Hrg. Tr. 228)  She testified that
CAF's IEP team did not agree with his parents that CAF should be
placed in a residential facility. (Hrg. Tr. 233) She testified
that the services that CAF needed can be provided on St. Thomas,
so she did not believe that he needed to be placed off-island.
(Hrg. Tr. 236)

As part of CAF's transition plan the VIDOE suggested
workplace placements that suited his interests.  These placements
functioned to provide CAF with job skills.  Among the placements
that were suggested were working as an assistant in the CAHS
library, working in the public library, working in the hospital's
laundry room, and working as a greeter at Havensight.  CAF's

*C.A.F. v. Michael, et al.*
Civil No. 2006-102
Memorandum Opinion
Page 24

parents rejected these placements.  They stated that the library
was not a suitable placement because CAF had worked in a library
previously and was easily distracted, talkative, and would pull
down books off of the shelves to read on his own.  The greeter
placement was rejected because the parents were afraid CAF would
walk off with strangers.  The parents rejected the laundry
position because they thought he could do better than the laundry
room.  (Hr'g Tr. 274)  In response to these concerns, Lake-Thomas
stated that CAF needed to be exposed to workplace settings to
improve his social skills because it would enable him to model
appropriate behaviors. (Hrg. Tr. 254)

Lake-Thomas also testified that under an arrangement by the
VIDOE with the Virgin Islands Department of Human Services, the
Vocational Rehab program, provides services for persons with
disabilities and offers job placement or training beyond the
public school level.  Lake-Thomas referred to this program as a
thirteenth year option. VIDOE offered to assist the parents in
obtaining admission for CAF in this program.  According to Lake-
Thomas, the parents rejected the offer.  The parents preferred
that VIDOE assume responsibility for placement of CAF in a
residential facility.

**2. Adequacy of CAF's FAPE under IDEA**

Under the IDEA

*C.A.F. v. Michael, et al.*
Civil No. 2006-102
Memorandum Opinion
Page 25

> [t]he state may be required in certain cases to fund
> residential placements. "If the educational benefits
> which can be provided through residential care are
> essential for the child to make *any* educational
> progress at all, then residential care is required
> under the EHA [the precursor to the IDEA]." *Burke
> County Bd. of Educ. v. Denton*, 895 F.2d 973, 980 (4th
> Cir. 1990) (emphasis in original). However, the IDEA
> "does not authorize residential care merely to enhance
> an *otherwise sufficient* day program." *Id.* (quoting
> *Abrahamson v. Hershman*, 701 F.2d 223, 227 (1st Cir.
> 1983) (emphasis in original)).

*Shaw v. Weast*, No. 08-1485, 2010 U.S. App. LEXIS 1703, at *14-15

(4th Cir. 2010).

The hearing officer found that the VIDOE had made available

to CAF a FAPE that offered the opportunity for "significant

learning" and "meaningful educational benefit". (Administrative

Decision and Order 16.)  The officer noted that VIDOE had made

available career education placements as part of CAF's

Individualized Transition Plan ("ITP").  The officer decided that

there was compliance with legal requirements to develop and

review annually CAF's IEP.

CAF's case is distinguishable from those in which the Third

Circuit has found that state-funded residential placement was

required under the IDEA.  CAF is not as profoundly disabled as

the children whose education was at issue in those cases. *See,*

*e.g*, *Diamond*, 808 F.2d 987 (3d Cir. 1986) (full time residential

placement necessary to providing a FAPE to a child born with

*C.A.F. v. Michael, et al.*
Civil No. 2006-102
Memorandum Opinion
Page 26

several congenital physical abnormalities and neurological impairments that impaired his ability to walk and communicate); *Kruelle v. New Castle County School Dist.*, 642 F.2d 687 (3d Cir. 1981) (residential placement necessary for profoundly retarded child).

Based on a careful review of the administrative record, the Court finds that the CAF has failed to meet its burden of proof. In accordance with the IDEA, the education the VIDOE provided CAF conferred more than a *de mimimis* benefit on him.  Accordingly, the Court will not disturb the administrative law judge's decision .

**3. Adequacy of CAF's FAPE under VIEHA**

By contrast with the IDEA, the VIEHA's purpose is to "maximize the capabilities of handicapped children." V.I. Code Ann. tit. 17, § 281.

There are no cases in the Virgin Islands defining "maximize."  However, other states with similar statutory language have case law discussing the term.

Like the Virgin Islands law, Michigan law requires maximizing a handicapped child's potential.  The law specifically states,

> The intermediate school board shall. . . . Develop, establish, and continually evaluate and modify in cooperation with its constituent districts, a plan for

*C.A.F. v. Michael, et al.*
Civil No. 2006-102
Memorandum Opinion
Page 27

special education that provides for the delivery of special
education programs and services designed to develop the
*maximum* potential of each student with a disability of whom
the intermediate school is required to maintain a record. .
. .

Mich. Comp. Laws § 380.1711 (1977) (emphasis added).

In *Edwin Burilovich v. Board of Education of the Lincoln
Consolidated Schools*, 208 F.3d 560 (6th Cir. 1999) the Sixth
Circuit discussed whether an IEP was designed to allow B.J.'s
"maximum potential." At the age of four, B.J. was diagnosed with
autism. B.J.'s parents began a home-based program called
discrete trial training (DTT).[10] *See Id*. at 562. B.J. also had
an IEP which provided him with Preprimary Impaired ("PPI")
services and speech and language therapy. The IEP allowed for
2.5 hours a day in the PPI program and 40-80 minutes per week of
speech and language therapy. The parents requested that DTT be
incorporated into B.J.'s school time. *Id*. Despite this request,
the school district did not include DTT in the IEP. Instead, the
school district proposed that B.J. be placed in a mainstream
kindergarten class with one-on-one support. The parents
disagreed with this plan and brought suit. *Id*.

In evaluating the record, the appellate court noted that the
witnesses involved in B.J.'s IEP differed as to the best method

_____

[10] DTT is an educational approach to treating autism.

*C.A.F. v. Michael, et al.*
Civil No. 2006-102
Memorandum Opinion
Page 28

of educating B.J. *Id*. at 571.  The parents' witness stated that less DTT caused B.J. to be less social.  The witness felt that a home environment was more suitable for B.J.  She asserted that B.J. would be overwhelmed in a mainstream class. *Id.*

The school district's witness stated that B.J. would benefit from mainstream kindergarten.  *Id*.  The witness stated that DTT emphasized B.J.'s deficits not his strengths.  Further, he noted that DTT, unlike the school program, did not account for a natural environment, peer reinforcement, or independence.  *Id.* Staff members at B.J.'s school also had problems with DTT because it appeared to be a package deal, without individualization for B.J. *Id.*

The appellate court held that the IEP was designed to allow B.J. to achieve his maximum potential, despite the differing views of the witnesses.  In affirming the district court's judgment, the court stated that the parents failed to show that the IEP was inappropriate.  *Id*. at 572.  The Sixth Circuit also emphasized that the school district's IEP was tailored to B.J.'s needs.

The appellate court further cautioned "[g]iven the differing opinions on both sides as to the best program for B.J. and the reasonable bases in the record for the opinion, we emphasize that courts should not 'substitute their own notions of sound

*C.A.F. v. Michael, et al.*
Civil No. 2006-102
Memorandum Opinion
Page 29

educational policy for those of the school authorities which they review.'" *Id.* at 572 (quoting *Board of Educ. v. Rowley*, 458 U.S. 176 (1982)).

In another Michigan case, *Yibing Dong v. Board of Education of the Rochester Community Schools*, 197 F.3d 793 (6th Cir. 1999), the parents of a handicapped child, Lisa, contended that their child's IEP failed to satisfy the "maximum potential" standard because it did not include a 40 hour DTT program. *Id.* at 797-98. In holding that the Lisa's IEP met the maximizing standard, the appellate court observed that Michigan's maximum potential standard "does not necessarily require the best education possible" or require a "a model education, adopting the most sophisticated pedagogical methods without fiscal or geographic constraints." *Id.* at 803 (quoting *Renner v. Board of Educ. of Public Schools of City of Ann Arbor*, 185 F.3d 635 (6th Cir. 1999)). The appellate court further stated that the parents' belief that the DTT program would be best able to develop Lisa's potential does not mean that it was the only FAPE that the District could offer under the IDEA. *Id.* at 803.

Massachusetts law also requires a maximizing standard. The law specifically states, "The department shall promulgate. . . regulations regarding programs for children with special needs. . . to assure the *maximum* possible development in the least

*C.A.F. v. Michael, et al.*
Civil No. 2006-102
Memorandum Opinion
Page 30

restrictive environment of a child with special needs . . . ."
*See* Mass Gen. Laws Ann. Ch. 71B § 2 (emphasis added).

In *Roland M. and Miriam M. v. The Concord School Committee, et al.*, 910 F.2d 983, (1st Cir. 1990), the First Circuit discussed the meaning of "maximum possible development." In *Roland,* the parents of a handicapped child appealed the district court's order upholding their child's individualized education program (IEP). The child suffered from difficulties with visual motor skills, visual perception, visual tracking, and fine and gross motor coordination. The child found it hard to relate to his peers and his real world functioning was impaired. Among other things, he was unable to ready himself for school and ate sloppily. *Id.* at 988. The parents unilaterally moved their child from a public school, Concord, to Landmark, a private residential school.

Thereafter, the parents requested the Bureau of Special Education Appeals ("BSEA") to re-evaluate the IEP and their child's placement in Concord. The BSEA made a detailed comparison of Concord and Landmark. The BSEA found that the child's main issue was a lack of socialization skills. It concluded that Concord proposed a better program because the child's needs were not severe enough for residential placement. *Id.* The BSEA found Landmark's regimen to be too restrictive.

*C.A.F. v. Michael, et al.*
Civil No. 2006-102
Memorandum Opinion
Page 31

The decision noted that the child progressed at Landmark, but the BSEA was "unconvinced that a nexus exist[ed]" between the child's improvement and tenure at Landmark.  Dissatisfied with this result, the parents brought suit.  They maintained that the IEP did not "assure the maximum possible development" of the child. *Id.* at 991 (quoting Mass. Gn. L. 71B § 2).

In determining whether the IEP maximized the development of the child, the appellate court stated "the issue [is] not whether Concord's program was 'better' or 'worse' than Landmark's in terms of academic results or some other purely scholastic criterion, but whether Concord's program, taking into account the totality of [the child's] special needs, struck an 'adequate and appropriate' balance on the maximum benefit/least restrictive fulcrum."  *Id.* at 993.

The First Circuit further maintained, that in this case the child's IEP must contain both academic as well socialization services.  *Id.* at 993 ("As a matter of maximizing [the child's] educational benefit, [socialization training, motor skills assistance, and academic help]...were properly considered by the IEP team, notwithstanding the parents' rather single minded focus on academic results. . . .  The IEP ensured socialization therapy with a psychologist and occupational therapy to improve [the child's] motor skills.")  The appellate court ultimately held

*C.A.F. v. Michael, et al.*
Civil No. 2006-102
Memorandum Opinion
Page 32

that the child's IEP assured the maximum possible development as required by Massachusetts law.  The court found the child's special needs regarding socialization training and motor skills were properly considered by the IEP team.  *Id.* at 993 ("The IEP ensured socialization therapy with a psychologist and occupational therapy to improve Matthew's motor skills.  It follows that Concord [program was] more appropriate and well-rounded than the Landmark program.")

The First Circuit further maintained, Landmark's regimen provided no motor skills training and no specific program of socialization therapy.  The First Circuit observed, "even under the Massachusetts standard, a program which maximizes a student's *academic* potential does not by that fact alone comprise the requisite 'adequate and appropriate' education."  *Id.* at 991 (emphasis added).

> In coming to its conclusion the appellate court cautioned,
>
> [a]n IEP is a snapshot, not a retrospective.  In striving for 'appropriateness,' an IEP must take into account what was, and was not, objectively reasonable when the snapshot was taken. . . . We think it well that courts have exhibited an understandable reluctance to overturn a state education agency's judgment calls in such delicate areas-at least where it can be shown that 'the IEP proposed by the school district is based upon an accepted, proven methodology.'

*Roland*, 910 F.2d  983, 992 (1st Cir. 1990) (quoting *Lachman v.*

*C.A.F. v. Michael, et al.*
Civil No. 2006-102
Memorandum Opinion
Page 33

*Illinois State Bd. Of Educ.*, 852 F.2d 290, 297 (7th Cir. 1988).[11]

There are several common elements in the appellate cases cited above.  In deciding whether the respective school districts met statutory maximizing standards, they analyzed whether the proposed IEPs met the individual needs of the child.  In evaluating the IEPs the Sixth Circuit noted that maximizing did not mean that school districts had to provide the absolute best education to the child without fiscal and geographical constraints.  Further, both appellate courts cautioned that reviewing courts should be reluctant to overturn a state agency's decision.

CAF's parents allege that his IEP did not provide him with a meaningful education.  They request that he be placed in a residential facility funded by the VIDOE.  CAF's IEP provided him with academic instruction as well as life skills training.  CAF's curriculum included English, Computer Literacy, Vocational Art, Functional Math, Adaptive PE, Vocational Training, and Career classes.  Through these classes he learned money math, how to write checks, how to do laundry, filing, typing, and limited

---

[11] The appellate court maintained that, "[b]eyond the broad questions of a student's general capabilities and whether an educational plan identifies and addresses his or her basic needs, courts should be loathe to intrude very far into interstitial details or to become embroiled in captious disputes as to the precise efficacy of different instructional programs."  *Id.* at 991 (citing *Board of Educ. v. Rowley*, 458 U.S. 176, 202 (1982)).

cooking skills.  Additionally, CAF's teachers testified that they provided additional instructional support to CAF in the area of self-care habits such as grooming and other independent living skills.

CAF's IEP also provided for transition services.  The transition services plan offered CAF Career Education, Vocational Education, and community based work-placements.  The Vocational Education classes and Career Education classes started from the 9th grade.[12] In his Career Education class CAF was given the opportunity to fill out job applications, write resumes, do some job role playing, and was placed at work-sites.  VIDOE provided CAF with different options as far as work placement.  (Hr'g Tr. 224)  However, many of these placements were rejected by the parents.  VIDOE was eventually able to provide a placement that was suitable to CAF's parents.[13]  By this time, however, several months had passed and CAF could only work at the job-site for

---

[12]  Lake-Thompson testified that, "[CAF's] first set of Career Education classes were started in September or August 2001.  And he continued the next September or August 2001.  And he continued the next Career Education class, Vocational Education class, in September of 2002.  He had a Career Education class in February of 2003, Career Education in September of 2003, Career Education in February of 2004, and he also had Career Education in February of 2005." (Hrg. Tr. 222-23)

[13]  In February, 2005, of the spring semester CAF worked at a day care where he read to children.  He also worked at TOPS, a souvenir business, where he did some filing.  In 2003, the parents also found a job placement on their own for CAF at Sam Goody's.  At Sam Goody's CAF assisted with restocking, customer service, and working the cash register. (Hr'g Order 8)

*C.A.F. v. Michael, et al.*
Civil No. 2006-102
Memorandum Opinion
Page 35

four months. (Hr'g Tr. 261)[14]

CAF's father asserted that despite the school's efforts over the past four years, CAF was unable to live independently because his life skills were very weak.[15]  Because CAF did not have skills needed to "exist in the work force in the real world," CAF's parents requested the VIDOE to provide CAF with a 13th year.[16]

Lake-Thomas testified that under an arrangement by the VIDOE with the Virgin Islands Department of Human Services, CAF was offered a 13th year option through their Vocational Rehab program. (Hr'g Tr. 229-230) The program is a collaboration of

---

[14] In the hearing Lake Thompson stated: "The recommendation for placement at the hospital [laundry facility] at any area could have been for a year and a half, if he was given the opportunity.  But every job opportunity that we proposed was rejected by the parents.  And so, finally, when he [sic] was accepted, he was only given the opportunity to work for about four months." (Hr'g Tr. 261)

[15] CAF's father, Dr. Anthony H. Francis, stated in the hearing "[T]he transition which was supposed to have taken place as soon as he went to CAHS...his transition into the work force, transition into independent care, that never materialized. . . . [CAF's] still needs constant prodding.  His life skills are very weak. [CAF] cannot exist out there by himself. . . . [H]e has not acquired the skills required to exist in the work force in the real world – and the Department did not meet those requirements for a child in Special Ed--that they find him--well fund what's called a 13th year for him and the Department would be responsible for him during that time." (Hr'g Tr. 50-51)

[16] The parents wanted to enroll CAF in the New York Institute of Technology ("NYIT"). However, when he was interviewed the school informed CAF's parents that he was not prepared for the program.  NYIT suggested that CAF enroll in a 13th year program. CAF's father stated "a thirteenth year is modeled for these kids who need life skills, they are going to these schools which will take them and teach them continuously, life skills, social skills, skills that they need to function, identifying areas of strengths which could be worked on." (Hr'g Tr. 54)

*C.A.F. v. Michael, et al.*
Civil No. 2006-102
Memorandum Opinion
Page 36

non-governmental organization within the community which provides
services for persons with disabilities and offers job placement
or training beyond the public school level.  The VIDOE offered to
assist CAF's parents in taking advantage of this option.  The
parents rejected the offer.[17]

CAF's teachers agreed that he had significantly improved in
the four years he attended CAHS.  Despite this, many of the
teachers and other witnesses stated that CAF needed more training
in life skills in order to live as an autonomous adult.  All of
CAF's teachers stated that CAF could live on his own with
supervision.  None of the witnesses affirmatively stated that a
residential placement would prepare CAF for autonomous living.

Based on the foregoing, the VIDOE provided CAF with an
education maximizing his capabilities.  In addition to academic
opportunities, CAF was provided with several avenues to maximize
his life skills and socialization skills.  VIDOE offered numerous
different internships to CAF which his parents rejected.
Further, VIDOE, in conjunction with the Virgin Islands Department
of Human Services, offered CAF a 13th year option to increase his

---

[17] Lake-Thomas stated, "All persons with disabilities qualify for Voc
Rehab....Voc Rehab has in the past, sent our students to technical schools, to
college, to training here on the Island, and also they try to help them to be
placed in a job force."  According to Lake-Thomas' testimony the Vocational
Rehab program was offered to CAF in November 2004 and in 2005. (Hr'g Tr. 229-
230)

*C.A.F. v. Michael, et al.*
Civil No. 2006-102
Memorandum Opinion
Page 37

life skills and job skills.  These were all opportunities where CAF could have increased his life skills

    In *Dong*, *Edwin*, and *Roland* the parents disagreed with the educational approaches the schools adopted for their respective children.  Like these parents, CAF's parents want CAF to be instructed in a particular manner and quality.  However, as the appellate court stated in *Dong*, maximizing "does not necessarily require the best education possible" or require a "a model education, adopting the most sophisticated pedagogical methods without fiscal or geographic constraints."  *Dong*, 197 F.3d at 803.

    Here, the preponderance of the evidence indicates that the public, day-school education that CAF received, maximized his capabilities, as required under Virgin Islands law.  Accordingly, CAF has not demonstrated a right to the off island residential placement he seeks.

## IV. <u>CONCLUSION</u>

    For the reasons explained above, this Court will enter judgment in favor of the defendants.  An appropriate judgment accompanies this memorandum opinion.

S/_____
**CURTIS V. GÓMEZ**
**Chief Judge**